This Opinion is a Precedent
of the TTAB

Mailed: July 24, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board
————
*In re Duracell U.S. Operations, Inc.*

————

Serial No. 90559208

————

Richard M. LaBarge, Michelle Bolos and Thomas Key of
Marshall, Gerstein & Borun LLP and Leo J. White of The Duracell Company,
  for Duracell U.S. Operations, Inc.

Keri Cantone, Trademark Examining Attorney, Law Office 104,
  Zachary Cromer, Managing Attorney.

————

Before Kuhlke, Lykos and Adlin, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Applicant Duracell U.S. Operations, Inc. seeks a Principal Register registration

for a sensory (sound) mark for "batteries," in International Class 9. The involved

application includes this description of the mark: "The mark is a sound. The mark

consists of three musical notes. The first note is a quarter note C4, the second is a

quarter note G3, and the third is a half note G4."[1]

The Examining Attorney refused registration under Sections 1 and 45 of the

Trademark Act, 15 U.S.C. §§ 1051 and 1127, on the ground that Applicant's

---

[1] Application Serial No. 90559208, filed March 4, 2021 under Section 1(a) of the Trademark
Act, 15 U.S.C. § 1051(a), based on an allegation of first use in commerce in 1974.

specimens are "mere advertising" for, rather than "displays associated with," the identified goods. After the refusal became final, Applicant appealed. The appeal is fully briefed. We reverse.

## I. Prosecution History

Applicant included with its original application: (1) a .jpg file depicting the mark as printed music (  ); (2) a .wav sound file containing only the three-note sound mark; (3) an audiovisual specimen, specifically a .wmv file containing a television commercial at the end of which the involved 3 note sound mark plays; and (4) another specimen (.pdf file) showing how Applicant promotes the involved goods on its website (apparently without the involved sound mark), a portion of which is reproduced below:



Serial No. 90559208

The Examining Attorney found Applicant's specimens unacceptable as "mere advertising" that "does not properly show the applied-for mark is actually used in commerce in International Class 09." August 10, 2021 Office Action at TSDR 2. The Examining Attorney argued that "a commercial that includes the sound" is unacceptable because "[a]dvertising is not acceptable as a specimen for goods." *Id.* The Examining Attorney suggested different types of specimens that could be acceptable, including "displays playing the sound associated with the actual goods at their point of sale." *Id.*

In response, Applicant submitted seven substitute specimens in the form of .mp3 files, accompanied by a declaration from Michelle Potorski, Applicant's Vice President of NA [North American] Marketing ("Potorski Dec."). Ms. Potorski testified that the substitute specimens include "audio messaging" played in stores where Applicant's involved goods are sold. February 10, 2022 Office Action response TSDR 9-12. Applicant's substitute specimens reveal the "audio messaging" to be commercials for Applicant's goods. As Ms. Potorski explains, these commercials, or "audio messaging," include Applicant's mark, referred to as the "slamtone," that has been featured in Applicant's advertising since the 1970's, "typically in a featured position near the end of each ad." *Id.* at 9, 12 (Potorski Dec. ¶¶ 3, 5(a)).[2]

---

[2] Ms. Potorski's Declaration is misnumbered, as it includes two "Paragraph 5"s and two "Paragraph 6"s. We cite the first Paragraph 5 at TSDR 9 as "5(a)", the first Paragraph 6 at TSDR 10 as "6(a)," the second Paragraph 5 at TSDR 12 as "5(b)" and the second Paragraph 6 at TSDR 12 as "6(b)."

3

Applicant pays for the "audio messaging" featuring the involved mark to be played in stores where Applicant "sells a large volume of batteries," including grocery stores as well as CVS and Rite Aid drug stores. *Id.* (Potorski Dec. ¶ 4). According to Ms. Potorski, "[t]his kind of promotion is a direct analog to traditional 'shelf talkers' … The ads are run as an inducement to purchasers to buy DURACELL batteries while shopping in the store." *Id.* Thus, Applicant contends that the "audio messaging" featuring the involved mark is advertising, and that it is analogous to a shelf-talker.

Applicant's commercials reproduced in the substitute specimens "aired more than 100 million times. Given normal store crowds during those times, there were well over one billion customer impressions." *Id.* at 10 (Potorski Dec. ¶ 6(a)). Ms. Potorski has visited stores where the commercials are played and testified based on those visits that "the messaging is clearly heard by shoppers at the shelves where DURACELL batteries are stocked, as well as throughout the store." *Id.* at 12 (Potorski Dec. ¶ 6(b)). Thus, the commercials in Applicant's substitute specimens are heard not just in the aisles where Applicant's goods are sold, but also throughout the stores where they are played. "[M]ore than a million DURACELL batteries have been sold in those stores where the ads featuring the slamtone were played, in the months when those ads were played in those stores." *Id.* (Potorski Dec. ¶ 5(b)).

The Examining Attorney was not persuaded by the substitute specimens or Applicant's arguments and maintained the refusal, referring again to Applicant's specimens as "merely advertisements for the applicant's goods." March 31, 2022 Office Action TSDR 1. The Examining Attorney went on to explain that a trademark

4

not used on the goods themselves, the goods' packaging or containers, or labels or tags for the goods, must be otherwise "directly associated with the goods," and used at the "point-of-sale." *Id.* at 2. Here, however, "[t]he commercials are playing overhead in a store, and are not coming from a display at the point of purchase;" furthermore, "there is no evidence that the commercials played in the stores increased sales of the batteries at the store" or "induced a consumer to purchase the goods." *Id.*

## II.  Analysis

"A mark is deemed in use in commerce on goods when, among other things, 'it is placed in any manner on the goods or their containers **or the displays associated therewith** or on the tags or labels affixed thereto.'" *In re Siny Corp.*, 920 F.3d 1331, 2019 USPQ2d 127099, at \*2 (Fed. Cir. 2019) (quoting 15 U.S.C. § 1127). Here, Applicant has not placed the involved sound mark on the goods or their containers, or on tags or labels affixed thereto; Applicant does not argue otherwise. Thus, we must determine whether the "audio messaging" in Applicant's specimens constitutes "displays associated" with Applicant's batteries.[3] In doing so, we keep in mind that, as the Examining Attorney points out, "[m]ere advertising is not enough to qualify as a display." *Id.* at \* 2-3 (citing *Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 226 USPQ 435,

---

[3] Under certain conditions sounds may "function as source indicators in those situations where they assume a definitive shape or arrangement and are used in such a manner so as to create in the hearer's mind an association of the sound with a [good]." *In re Gen. Elec. Broad. Co.*, 199 USPQ 560, 563 (TTAB 1978). The Examining Attorney's refusal is based only on Applicant's specimens, not the nature of the involved mark. There is no evidence that Applicant's identified batteries make the "slamtone" sound of Applicant's mark in their ordinary operation. *Cf. In re Vertex Grp. LLC*, 89 USPQ2d 1694, 1700 (TTAB 2009) (requiring a showing of acquired distinctiveness "[w]hen a sound is proposed for registration as a mark on the Principal Register, for goods that make the sound in their normal course of operation").

436 (Fed. Cir. 1985), *Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965), and *Lands' End, Inc. v. Manbeck*, 797 F.Supp. 511, 513, 24 USPQ2d 1314, 1316 (E.D. Va. 1992)). *See also In re Anpath Grp., Inc.*, 95 USPQ2d 1377, 1380 (TTAB 2010) ("a clear 'line of demarcation' has been drawn between mere advertising materials, which have been found unacceptable as specimens showing use of a mark for goods, and point-of-purchase promotional materials which have been found acceptable as a display associated with the goods").

Here, we find on this record that Applicant's in-store "audio messaging" serves as more than "mere" advertising. Specifically, unlike most television, radio, newspaper, Internet, billboard or other types of advertising that consumers might encounter at home, in their cars or in other non-retail locations, Applicant's advertising/"audio messaging" is transmitted repeatedly (often multiple times per hour) in retail locations where the identified goods are displayed and available for purchase. It can be heard in the section of the store where the goods are located. In fact, according to Ms. Potorski, the messaging/advertising is "clearly heard by shoppers at the shelves where DURACELL batteries are stocked." February 10, 2022 Office Action response TSDR 12 (Potorski Dec. ¶ 6(b)).[4]

That makes this case less like those involving "mere" advertising, and more analogous to *Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34 (CCPA 1970)

---

[4] We find Ms. Potorski's undisputed testimony, which is supported by schedules, statistics and recordings of the "audio messaging," credible. Other types of documentary evidence, such as a video depicting a store's battery aisle during business hours in which the sound mark is audible, could also be probative of trademark use.

and *In re Marriott Corp.*, 459 F.2d 525, 173 USPQ 799 (CCPA 1972), both of which involved specimens found to be more than "mere" advertising by virtue of being displayed in retail locations. *See also In re E. Kahn's Sons Co.*, 343 F.2d 475, 145 USPQ 215, 216 (CCPA 1965) ("While appellant's slogan unquestionably does serve to advertise its wieners, as it appears on bacon packages, we disagree that this is its **sole** use or function. We believe it is **also** used **as a trademark** on bacon.").

In *Roux*, one issue on appeal was whether Clairol had made use of the slogan "HAIR COLOR SO NATURAL ONLY HER HAIRDRESSER KNOWS FOR SURE" for hair coloring preparations. "[T]he slogan [had] not been used on the containers in which the hair color preparation has been packaged or on the bottles of hair color preparation themselves." *Roux*, 173 USPQ at 36. Nonetheless, the Court found that Clairol made trademark use of the slogan, because it was "prominently used on relatively large counter or window display cards of the stand-up type in close association with the goods." *Id.* at 41. Thus, the Court agreed that although this was "a use in a form of advertising to be sure," it "nevertheless," and at the same time, constituted "a use on 'displays associated' with the goods" that "satisfies the provisions of § 45" of the Act. *Id.* Specifically, the slogan "performs the basic function of a trademark," as "a means by which the public can identify the goods as those from a particular source and can distinguish those goods from those of others." *Id.*

In *Marriott*, the applicant sought to register TEEN TWIST for a sandwich, submitting as specimens "menus upon which the mark appears as a designation for a ham, cheese and tomato sandwich." *In re Marriott*, 173 USPQ at 799. The question,

as in *Roux*, was whether the specimens/menus qualified as "displays associated with the goods," and the Court found, much as in *Roux*, that they did. In doing so, the Court rejected the Board's requirement in *In re Marriott-Hot Shoppes, Inc.*, 156 USPQ 257 (TTAB 1967) that there must necessarily be a "close physical association" between a mark and the goods it identifies, pointing out that the Trademark Act "does not specifically require 'close physical association.'" 173 USPQ at 800. Rather, the Court held that "'association with the goods' is a relative term amenable to proof." *Id.* at 800. *See also In re Shipley Co.*, 230 USPQ 691, 692 (TTAB 1986) ("Section 45 of the Trademark Act does not define the term 'displays associated therewith,' and the Examining Attorney and the Board must make a case-by-case determination of whether a particular use asserted to be a 'display' is adequate to demonstrate use in commerce."); *Lands' End*, 24 USPQ2d at 1316 ("The trademark statute does not require that the mark be affixed or have 'close physical association' to the goods.").

In *Marriott*, the menu bearing the TEEN TWIST mark listed "ingredients which compose the TEEN TWIST sandwich and also frequently has a small illustration of the sandwich," and was the means by which customers ordered the sandwich. The menu was thus found to be "a display of appellant's offering directly associated with appellant's goods … The fact that after the order is taken it is a short period of time until that order is translated into a sandwich delivered to the customer does not militate against the efficacy of the mark's association with the goods." *In re Marriott*, 173 USPQ at 800. The Court "specifically reject[ed] the board's suggestion that the

8

displays must be in physical contact with the goods in order to be associated therewith." *Id.*

In another case, after reviewing *Roux*, *Marriott*, and a number of additional Board and court cases, the Board held that to fall within Section 45's definition of "displays associated with the goods" (as opposed to "sounds" or "recordings" associated with the goods), the displays must be

> essentially point-of-sale material such as **banners, shelf-talkers**, window displays, menus, or similar devices which are **designed to catch the attention of purchasers and prospective purchasers as an inducement to consummate a sale** and which **prominently display the mark in question and associate it or relate it to the goods** in such a way that an association of the two is inevitable even though the goods may not be placed in close proximity to the display or, in fact, even though the goods may not physically exist at the time a purchaser views the display.

*In re Bright of Am., Inc.*, 205 USPQ 63, 71 (TTAB 1979) (emphasis added). Here, we find that while Applicant's mark is a sound rather than a visual display, it is consistent with the standards laid out in *In re Bright of America*.[5]

Indeed, based on Ms. Potorski's testimony, we find that Applicant's specimens perform the same functions as those found adequate in *Roux* and *In re Marriott*. That is, while traditional "banners," "shelf-talkers," menus and window signs display

---

[5] While "[t]he Board does not read the *Marriott* and *Roux* cases as sanctioning a total physical separation of goods and marks under the 'displays associated with goods' test," *In re Columbia Chase Corp.*, 215 USPQ 478, 479 (TTAB 1982), here there is no "physical separation," much less "total physical separation." To the contrary, according to Ms. Potorski Applicant's audio "messaging is clearly heard by shoppers at the shelves where DURACELL batteries are stocked." February 10, 2022 Office Action response TSDR 12 (Potorski Dec. ¶ 6(b)).

marks visually, and Applicant's in-store "audio messaging" transmits Applicant's three-note sound mark audibly, both visual displays and sounds may be exposed to consumers near the goods and can be "designed to catch the attention of purchasers and prospective purchasers as an inducement to consummate a sale." *In re Bright of Am.,* 205 USPQ at 71. For example, Applicant's "audio messaging" is transmitted throughout stores where Applicant's identified goods are sold, via in-store sound systems, a common way to "catch the attention of purchasers," *id.*, and convince them to buy something. In other words, Applicant's audio messaging is designed to "induce" in-store shoppers to "consummate a sale." *Id.*

Moreover, while the marks in *Roux* and *Marriott* were seen, and the three-note sound mark in Applicant's "audio messaging" is heard, in each of these cases the mark in question is "associated" with the goods, whether visually or aurally. In the case of Applicant's mark, the three-note sound is played in the same messages that explain the benefits of Applicant's goods, including that DURACELL batteries are "trusted," and that DURACELL OPTIMUM batteries deliver "extra life" in some devices and "extra power" in others. February 10, 2022 Office Action response TSDR 10 (Potorski Dec. ¶ 5(a)). These messages featuring Applicant's sound mark have been played in tens of thousands of stores where Applicant's batteries are sold, often multiple times per hour, and in total the ads in question, and the slamtone, "aired more than 100 million times." *Id.* at 10-11 (Potorski Dec. ¶ 6(a)). Thus, Applicant's audio messaging is analogous to a display associated with the goods. *Cf. In re Sones*, 590 F.3d 1282, 93 USPQ2d 1118, 1123 (Fed. Cir. 2009) ("The PTO recognizes that '[i]n effect, the

website is an electronic retail store, and the web page is a shelf-talker or banner which encourages the consumer to buy the product.'" (citing, *inter alia*, TRADEMARK MANUAL OF EXAMINING PROCEDURE § 904.03(i) (July 2022)).[6]

## III. Conclusion

Applicant's substitute specimens demonstrate trademark use, because the record shows that Applicant's sound mark is used in the aural equivalent of a "display associated with the goods."

**Decision**: The refusal to register Applicant's mark for the identified goods under Sections 1 and 45 of the Trademark Act is reversed.

---

[6] While some store customers who hear Applicant's messages will not be shopping for or have any interest in batteries, the specimens reveal trademark use because Applicant's advertising targets those customers who are or might be interested in batteries.